KRAMER, Respondent, vs. CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD COMPANY, Appellant.

*October 14—November 9, 1937.*

For the appellant the cause was submitted on the briefs of *Bender, Trump & McIntyre* of Milwaukee.

For the respondent there was a brief by *Shaw, Muskat & Paulsen* of Milwaukee, and *Simmons, Walker, Wratten & Sporer* of Racine, and oral argument by *Martin R. Paulsen*.

FRITZ, J. The injuries, which resulted in the damages for which the plaintiff recovered judgment, were sustained by

him upon falling from a boxcar on July 18, 1933. The car was in a train of three freight cars, which the plaintiff, as an employee of the Milwaukee Electric Railway & Light Company (hereinafter called the "Electric Company") and his coemployee, Chas. Warnke, were about to haul with an electric switching engine from a sidetrack on the right of way of the defendant, the Chicago, Milwaukee, St. Paul & Pacific Railroad Company, to tracks in the yards of the Electric Company. The train had been standing on that sidetrack about seventeen hours after it was placed or "spotted" there, on the preceding day, by the defendant's switching crew for the Electric Company to haul to its yards. Shortly before plaintiff was injured, Warnke had backed the electric engine southward on the sidetrack toward the train until there were but two feet between the automatic coupling equipment on the engine and the boxcar, at the north end of the train. Then the plaintiff had stepped between that car and the engine and set the coupling equipment on each of them in position to couple automatically when Warnke backed the engine for the impact necessary to effect a coupling. But on that impact the coupling pin or lock block of the coupling device on the freight car failed to drop so as to complete or "make" the coupling, and Warnke moved the engine so as to have again about two feet between the coupling equipment of the engine and the car. The plaintiff again set that equipment in position to couple automatically, and Warnke backed the engine toward the freight car. But on that second impact its coupling-lock block again failed to drop and complete the coupling. However, the three cars began to roll southward away from the engine, down a slight incline in the sidetrack, which was connected at the further end with other tracks that were connected with the defendant's main line. Upon seeing the cars roll away with increasing momentum, the plaintiff and Warnke ran toward and along the east side of the nearest car to get to ladders on which to climb to set hand brakes.

On reaching the south end of the first car, and seeing that there was no ladder on the east side of that car, the plaintiff ran back to and around its north end, and then south on the west side thereof to a ladder at that end and side of that car. He climbed that ladder to a narrow foot platform at that end of the car, on which he had to stand in order to operate a hand brake. Meanwhile Warnke had passed the plaintiff on the east side of the first car, and ran past the second car to the further end of the third car, which was a gondola car loaded with coal. He climbed up on that car and began tightening its hand brake, without being observed by the plaintiff. As that brake began to become effective to stop the train, the jolting thereof caused the plaintiff to fall to the track and his left leg was crushed under one of the car wheels.

In answer to the questions submitted for a special verdict, the jury found that the defendant, (a) negligently failed to properly set brakes to hold the three cars left on the side-track; (b) failed to furnish a place of employment; and (c) also failed to use safety devices and safeguards reasonably adequate to render that place as safe for plaintiff as the nature of the place and of the employment to be performed there reasonably permitted; (d) that the automatic coupling equipment on defendant's freight car was in a defective condition at the time and place in question; (e) that each of those failures on the part of the defendant, as well as the defective condition of the coupling device, was a proximate cause of the plaintiff's injury; and (f) that he did not fail to use ordinary care for his safety. Upon those findings and the jury's assessments of the plaintiff's damages, the court entered the judgment for plaintiff, from which the defendant appealed.

The defendant's principal assignments of error are that because there is no evidence to sustain any of those findings, the court erred in failing to grant its motions for a directed

verdict, and for judgment notwithstanding the verdict; and erred in submitting to the jury each of the questions which resulted in those findings. In passing upon those assignments, due consideration must be given to the rules that "if the evidence is conflicting, or if the inferences to be drawn from the credible evidence are doubtful and uncertain, and there is any credible evidence which under any reasonable view will support or admit of an inference either for or against the claim or contention of any party, then the rule that the proper inference to be drawn therefrom is a question for the jury should be firmly adhered to, and the court should not assume to answer such question either upon a motion for nonsuit or direction of verdict, or by substituting another answer after the verdict is returned;" and that, consequently, the inquiry is limited to the narrow issue of "whether there is any credible evidence which, under any reasonable view, will admit of inferences which may have been drawn by the jury in" arriving at its findings. *Trautmann v. Charles Schefft & Sons Co.* 201 Wis. 113, 115, 116, 228 N. W. 741. With those tests in mind, it must be noted, in passing upon the defendant's contention that there was no evidence to sustain the jury's finding that the defendant negligently failed to set brakes to hold the three cars left on the sidetrack, that there was evidence to the following effect, in addition to the facts stated above. The sidetrack, on which the defendant's crew spotted the cars, was entirely within the defendant's right of way, which was considerably lower than the adjacent premises, and separated from the Electric Company's yard by a high fence. Because that sidetrack sloped somewhat, it was customary and there was applicable defendant's rule requiring its crews to set brakes on cars spotted there, so that they would not roll away upon even the usual impacts necessary to couple onto them. Upon mounting the cars and starting to apply the hand brakes, Warnke and the plaintiff found that they had to first take up the slack before

the brakes became effective. If they had been properly set at the time of the two impacts, which were made with no more force than was necessary and customary to effect a coupling, the wheels would not have turned and the cars would not have moved more than a foot or gained momentum as they rolled down the track. On testifying, none of the defendant's crew could definitely recollect that they set the brakes when they spotted the cars. The conductor's testimony was merely that he had seen the switchman setting a brake two cars away, and the latter said that he testified that he had set them because he always set brakes on cars at that place.

It is true, as the defendant asserts, that, as a general rule, presumptions are not considered to run backward; and that therefore the mere fact that the cars rolled away upon the second impact does not establish, as a conclusion having the dignity of a legal presumption, that the brakes had not been properly set seventeen hours prior thereto. However, it does not necessarily follow that, in view of all the other facts and circumstances stated above, there was not some circumstantial evidence of sufficient probative value to warrant the jury in reasonably inferring and finding that when the defendant spotted the cars, which continued to remain in its custody on its inclosed or depressed right of way, it negligently failed to properly set the brakes as required by its rules and practice. The facts that the cars may not have moved for seventeen hours in the absence of any impact, or even upon the first impact, are significant, but they do not compel the conclusion that the brakes were properly set, and that there was no negligence in failing to have them set so as to prevent the cars from rolling after a second impact of but the usual and necessary character. Proper setting, and the exercise of ordinary care in setting the brakes, required them to be set so as to keep the cars from rolling away when subjected to such impacts, in point of force and number, as the defendant ought reasonably to have anticipated would occur upon the

Electric Company's attempt, in the exercise of ordinary care on the part of its employees, to make an automatic coupling.

The defendant contends that the jury's finding that the automatic coupling equipment on its freight car was in a defective condition was unwarranted because there was no proof of any particular defect therein; and that the mere proof that the equipment failed to couple upon the first or second impacts did not establish any evidentiary fact from which the jury could find that there was a defective condition. It is true that there was no testimony by any witness who had inspected the equipment that there was any particular defect therein; and that several of the defendant's employees testified that they found no defects therein on inspections made by them shortly after the accident, and also on the day following. However, as the plaintiff contends and as was held in *Chicago, M., St. P. & P. R. R. Co. v. Linehan* (C. C. A.), 66 Fed. (2d) 373, such testimony as to subsequent inspections does not establish conclusively that there was no defective condition at the time of an accident. The weight and effect to be given such testimony depends upon the credibility of the witnesses, and their knowledge, experience, and similar matters, which it is within the province of the jury to take into consideration in passing upon their testimony. Consequently, such evidentiary effect as proof of the failure of equipment to couple upon impact may have upon the issue as to whether it was defective is not conclusively defeated by the testimony of witnesses that they did not discover any defects upon subsequent inspections. *Chicago, M., St. P. & P. R. R. Co. v. Linehan, supra.*

On the other hand, the plaintiff contends that there was sufficient evidence to reasonably admit of the jury's finding that the equipment was defective, because, in addition to the proof that the coupling failed to make on the first and second attempts, there is in the record,—as the plaintiff rightly asserts,—evidence, which the jury could believe, to the follow-

ing effect: That the automatic coupling devices on the freight car and the electric engine were interchangeable and made according to standards provided by the federal government regulations; that, if such equipment is in good condition, and placed in proper horizontal and vertical alignment, and there is a proper impact, the equipment will make the coupling, but if it does not make under such circumstances, there is some defective condition therein; and that at the time of the impacts the plaintiff had placed the equipment in proper alignment, and the impacts were made in the customary manner, and with the proper and usual force so as to give a sufficient,—but not too hard a blow to the coupler head to cause the lock block to drop and thus complete or make the coupling.

With those facts in evidence, the fact that the lock block failed to drop as it should have done upon each impact constituted sufficient evidence to admit of the jury's finding that the equipment was in a defective condition because it did not measure up to the requirements prescribed in the Federal Safety Appliance Statutes. In view of the positive duty imposed by the statute upon the railroad to furnish safe appliances for the coupling of cars (*Minneapolis & St. L. R. Co. v. Gotschall,* 244 U. S. 66, 37 Sup. Ct. 598, 61 L. Ed. 995, 996), there is applicable, under such circumstances, the court's statement in *Pennsylvania R. Co. v. Jones* (C. C. A.) 300 Fed. 525, 527, that—

"Apparently coupling by impact will always occur automatically, unless there is some defect or some abnormal attendant condition. Hence a failure to couple usually tends to show a coupler defect."

And, therefore, such a failure is held sufficient, in connection with facts similar to those stated above, to sustain a finding that the equipment was defective. *San Antonio & A. P. R. Co. v. Wagner,* 241 U. S. 476, 36 Sup. Ct. 626, 60 L. Ed. 1110; *Pennsylvania R. Co. v. Jones, supra; Chicago, M.,*

*St. P. & P. R. R. Co. v. Linehan, supra; Minneapolis &
St. L. R. Co. v. Gotschall, supra; Holz v. Chicago, M., St. P.
& P. R. Co.* 176 Minn. 575, 224 N. W. 241, 243. The
evidentiary effect of that failure and the other proof was
not necessarily defeated by the facts that there was some
curvature in the track because of which the component parts
of the coupling equipment might not have been in such
alignment as was necessary to effect a coupling, and that the
coupling equipment on the electric engine was at the end of
a long radial drawbar, which was necessary to enable opera-
tions around curves of shorter radius in street railway tracks,
but was not used as standard railroad equipment. In view
of the evidence by expert witnesses that the coupling devices
on the electric engine and on the freight car were inter-
changeable, and made according to the standards provided
by the federal government regulations, and that exact align-
ment, horizontally and vertically, of the equipment was not
essential because it was constructed to function equally well
although there were deviations of a few inches in either of
those respects, the jury could consider the facts as to the
curvature in the track and the longer radial drawbar on the
engine insufficient to avoid the conclusion that the failures
to couple were due to a defective condition in the equipment
on the car.

Defendant also assigns error on the ground that the court
sustained,—instead of setting aside on the defendant's mo-
tion,—the jury's findings that the defective condition of the
coupling equipment on the freight car, and the defendant's
negligence in failing to properly set brakes, and in failing
to furnish a safe place and use reasonably adequate safety
devices and safeguards, were proximate causes of the plain-
tiff's injury. Defendant contends that the only proximate
causes of plaintiff's injury were, (1) the jolt of the train
upon Warnke's intervening act of setting the brake; and
(2) the plaintiff's intervening failure to properly brace him-

self while he was standing on the little platform trying to set a brake. The defendant argues that because there was no accident, and no harm could come to the plaintiff by or upon the cars starting to move, its failure to have the brakes set properly was but the occasion for the moving of the cars, and not a proximate cause of injury to the plaintiff; and that likewise because he was not injured while engaged in the act of making or unmaking a coupling, a defective condition therein was not a proximate cause under the rule stated in *Morey v. Lake Superior T. & T. Co.* 125 Wis. 148, 155, 103 N. W. 271, as follows:

"Whenever a new cause [independent intervening circumstance] intervenes which is not a consequence of the first wrongful cause, which is not under the control of the wrongdoer, which could not have been foreseen by the exercise of reasonable diligence by the wrongdoer, and except for which the final injurious consequences would not have happened, then such injurious consequences must be deemed too remote to constitute the basis of a cause of action."

It will be noted under that statement of the rule that one of the essential conditions in respect to a new intervening cause, which is claimed to render a first wrongful cause too remote to constitute the basis for liability for injurious consequences, is that the new intervening cause must not be a consequence of the first wrongful cause. Consequently, under that rule the jury's findings as to proximate causes were not erroneous if there was evidence because of which the jury could and did reasonably believe that the acts of Warnke and Kramer, after the cars had started to roll away, were but natural consequences of the defendant's prior causal negligence in setting the brakes, or the defective or unsafe condition of the coupling equipment. In support of the plaintiff's contention that the jury was warranted in considering his and Warnke's acts and conduct but the natural consequences of the prior wrongful causes for which the

defendant was responsible, the plaintiff relies on the decisions in a case reported in *Brown v. New York Cent. R. Co.* (D. C.) 53 Fed. (2d) 490, and *New York Cent. R. Co. v Brown* (C. C. A.), 63 Fed. (2d) 657, 658. Those decisions are in point because of the similarity of the facts in that case in essential respects, and the occasion for the application therein of the same principles of law. In that case the plaintiff, Brown, a yard brakeman in the employ of the railroad, was engaged at night with the other members of a switching crew in switching cars in the railroad's yard. While the crew was attempting to couple a switch engine to a refrigerator car, an automatic coupler on the latter failed to make, and the impact started the car moving on a downgrade, toward the defendant's tunnel. Brown and the conductor, realizing that unless the car could be stopped at once it might cause injury, sprang to the car ladders for the purpose of applying brake wheels on top of the cars. Brown on mounting the car hurriedly reached for the brake wheel. In so doing his head brushed an overhead electric third rail, from which he received a shock that caused him to fall to the ground and sustain serious injuries. The appellate court, in holding that there was a jury issue as to whether the failure of the coupling appliance on the refrigerator car to function automatically was the proximate cause of Brown's injury, said:

". . . It has long been settled that the chain of causation is not broken by an intervening act which is a normal reaction to the stimulus of a situation created by negligence, and such normal reaction has been held to include the instinct toward self-preservation, *Stott v. Shepard,* 2 W. Bl. 892 (the lighted squib case), and the equally natural impulse to rush to others' assistance in emergency, *Wagner v. International Ry. Co.* (Cardozo, C. J.) 232 N. Y. 176, 133 N. E. 437, 19 A. L. R. 1. . . .

"To determine whether there was a continuous succession of events leading proximately from fault to injury, the test

is not whether the plaintiff was acting in performance of his duty when injured, but whether his act was a normal response to the stimulus of a dangerous situation created by the fault. . . .

"If we are right in our understanding of the rule, there was substantial evidence before the court below upon which to submit the cause to the jury upon the issue of proximate cause."

That decision is in accord with the rule stated in the Restatement of the Law of Torts, § 443, as follows:

"An intervening act of a human being or animal which is a normal response to the stimulus of a situation created by the actor's negligent conduct, is not a superseding cause of harm to another which the actor's conduct is a substantial factor in bringing about."

In the "Comment" published with that rule it is stated:

"It is not necessary that an act which is done by the person harmed or by a third person should be 'reasonable;' that is, that the act should be one which a reasonable man would regard as not involving an unreasonable risk to himself or others. It is enough that the act is a normal response to the stimulus of the situation created by the actor's negligence. If it be done by the person who is harmed and is unreasonable in the sense above stated, it may amount to contributory negligence which as such prevents him from recovering, . . . but the actor's negligent conduct is none the less the legal cause of the harm. If the act be done by a third person, its unreasonable character may make him as well as the actor whose negligence created the situation liable to the person harmed thereby."

Consequently, as the intervening acts of the plaintiff and Warnke in endeavoring to stop the cars could reasonably be considered by the jury to be but their normal response to the stimulus of the situation and emergency created by the defendant's prior wrongful causes, those acts were not such superseding causes as to relieve the defendant from liability for the plaintiff's injury. It follows that the court did not

err in allowing the jury's findings as to proximate cause to stand, in so far as the defendant's negligence in not properly setting the brakes, and the defective condition of the coupling equipment are concerned.

The defendant also assigns as error the court's submittal of questions to the jury for a verdict as to whether the defendant failed, (1) to furnish a place of employment, and (2) to use safety devices and safeguards reasonably adequate to render that place as safe for the plaintiff as the nature of the place and nature of the employment to be performed there reasonably permitted. Defendant contends that there was no evidence to support affirmative findings in either of those respects; that the jury's findings in those respects show its temper and willingness to find without any evidence in support thereof; and that in those respects there was no testimony otherwise than on the specific issues covered by the jury's findings as to the defendant's negligence in failing to properly set the brakes, and the defective condition of the coupling equipment. A statement by plaintiff's counsel, on moving at the conclusion of testimony for leave to amend his complaint by charging a violation of the safe-place statute, discloses that the defect relied upon in respect to the place of employment was solely the incline in the track on which the defendant spotted the three cars; and in contending in his brief on appeal that there was an issue as to whether the defendant failed to furnish a "safe place," the plaintiff relies solely on the evidence as to "slopes and grades and location of the tracks." That evidence shows that the track on which the three cars were spotted was part of the defendant's right of way, which was depressed pursuant to orders of the railroad commission; and that to have an "operating grade" for that track it was necessary to have the incline in question in order to connect at its one end with the track to the Electric Company's yard, and at its other end with other tracks to enter the main line. As there is no

basis whatsoever in the evidence from which it can be inferred that because of the incline due to that necessary operating grade the place furnished was not as safe for the plaintiff as the nature thereof and of the employment to be performed reasonably permitted, it was error to submit that issue to the jury; and its unwarranted answer does disclose willingness to find without any evidentiary basis.

Furthermore, as defendant contends, in so far as any issue in relation to failure to use reasonably adequate safety devices and safeguards was involved, it was substantially and sufficiently submitted under the question as to whether the automatic coupling equipment on defendant's car was defective. The dual submission of virtually the same issue, and having the jury return two findings based on the same delinquency, unduly emphasized the significance of that lapse of duty to such an extent that, coupled with the error in submitting the question as to a failure to furnish a safe place of employment, the jury may have been seriously affected thereby to the prejudice of the defendant. The danger of such errors unduly prejudicing the jury was greater in this case because of the sympathy for the plaintiff, which was naturally aroused by his exceptionally severe and distressing injuries; and in view thereof and of the meagre basis in the evidence for finding any actionable conduct or default, upon which a recovery from the defendant could be predicated, it was particularly important and necessary to avoid everything that improperly tended to be prejudicial.

Defendant also assigns error on the ground that the court refused to set aside the jury's finding that the plaintiff did not fail to exercise ordinary care for his own safety; and that no causal negligence was attributable to him. The only respects in which the defendant claims there was contributory negligence are plaintiff's failure, (1) to board the car more promptly before it had gathered so much momentum; (2) to brace himself on the little platform; and (3) to

ascertain what Warnke was going to do. Whether there was any contributory negligence because of any such failure while the plaintiff was endeavoring to act with the speed necessitated by the existing emergency was clearly a question for the jury; and the evidence fully warranted its findings on those subjects.

Likewise, the defendant's assignments of error in relation to the court's rulings on questions of evidence, its instructions to the jury, and its refusal to grant a new trial on the ground of the misconduct of the clerk of the court and one of the jury commissioners, cannot be sustained. The misconduct of the clerk and the commissioner, which resulted in the latter, at the clerk's suggestion, taking the names of five jurors off the list of jurors filed with the clerk before the name slips were written and deposited in the box, was clearly unlawful. But as the defendant did not object because of that irregularity until after the verdict was returned, and there is no showing that it was injured thereby, it is not entitled to have the verdict set aside on that ground. Sec. 270.52, Stats.; *Ullman v. State,* 124 Wis. 602, 103 N. W. 6; *Emery v. State,* 101 Wis. 627, 78 N. W. 145.

The defendant, furthermore, assigns error on the ground that the court refused to reduce the damages assessed by the jury, or grant a new trial in the interests of justice because the verdict was excessive. No exception is taken to the item of $2,301.80 assessed, at the court's direction, for hospital and medical expenses. Defendant challenges the jury's assessment of $5,000 as damages for plaintiff's pain and suffering, and loss of capacity to enjoy life. That assessment was fully warranted by evidence to the following effect: The plaintiff was forty-eight years of age and of perfect physique at the time of his injury. Upon falling from the car his left leg doubled up and landed on the track in such a position that a car wheel went over the lower part thereof, and stopped with part of the wheel on the femur bone. After it

was found impossible to raise the car with jacks during forty minutes, it had to be moved with a crowbar so that the wheel again ran over the leg. During that time the plaintiff was conscious and heard the men working with the jacks. Likewise, although he was in a greatly shocked state and had lost much blood when he arrived at the hospital, he was still sufficiently conscious to talk with his wife and the doctor, and hear statements as to the necessity for amputating his leg, and doubt as to his survival. The wheel had completely severed both bones of the leg below the knee and had also cut and entirely severed the femoral artery above the knee. The traumatic fracture had severed the femur between the knee and the hip, and the muscular structures and skin were torn off just a little below the hip. The middle phalanx of the ring and of the middle fingers was also injured so that they had to be amputated. In addition he sustained cuts on the head and one ear. The first operation required an hour and forty-five minutes. To secure muscular structures, the amputation was necessary about five inches below the hip joint, but as the skin had been torn away, and there was not sufficient available skin to cover the stump, it was necessary to make a skin graft to properly cover it. That grafting was done about seven weeks after the accident with skin obtained by taking skin from the right leg, and it required practically all the skin from that thigh. After the operation the injury was very painful because of the large scar, and because there was no skin over it, and it was extremely sensitive and necessary to dress it twice or even oftener each day. After the accident, the haemoglobin in plaintiff's blood was about forty-five per cent of the normal amount, which was a secondary anæmia. Up to the time of the trial, three years after the accident, plaintiff still had a stinging, burning pain in the leg, which affected his ability to sleep; his back was occasionally affected; and he was very nervous. With the stump only about five and one-half inches long, it was very difficult to

apply an artificial limb, and therefore necessary to use a so-called "cradle" limb, the points of which, that the weight rests on, are entirely different from where there is a longer stump. He has experienced great difficulty in using that limb, and cannot maintain his balance in getting about with it, and twice has fallen down because of it. In view of those serious conditions and consequences, the jury's assessment of $5,000 as damages for plaintiff's pain and suffering and loss of capacity to enjoy life was clearly not excessive.

Defendant also challenges the jury's assessment of $25,000 as damages for plaintiff's loss of earnings and earning capacity. When injured on July 18, 1933, he was earning $140 per month, or $1,680 per year. Upon being able to work again, he was employed by the Electric Company as a watchman, and earned $261.17 in 1934; $324.60 in 1935; $393.62 in 1936; or a total of $979.39 for those three years. That total compared to his former earnings of $1,680 annually discloses an actual loss of $4,060 for those three years; and adding thereto his loss of $770 for the last five and one-half months of 1933, makes his total wage loss up to the time of the trial $4,830. Deducting that accrued loss from the jury's assessment of $25,000 leaves a balance of $20,170, as the jury's allowance for his future loss in earnings and earning capacity. At his age of forty-eight years when injured, his expectancy under the mortality table was twenty-two years, which would extend his life to seventy years of age. For that period, less the first three and one-half years which had elapsed up to the time of the trial, his total probable loss would be $24,605, if it is assumed that his annual loss would continue at the uniform rate of $1,330, although often the earning capacity of men engaged in such strenuous activities declines materially as they age. But as that total of $24,605 would accrue only at the rate of $1,330 per year, during each of the last eighteen and one-half years of plaintiff's expectancy, if he is to be paid presently instead of being indemnified

in each of those years, he is entitled to but the present value thereof, which would be $12,781.81, if computed on the basis of five per cent simple interest; or $14,140.80 if computed on the basis of four per cent simple interest. Those amounts are, respectively, $7,388.19 and $6,029.20 less than the balance of $20,170, which was apparently allowed for plaintiff's future loss in the jury's total assessment of $25,000 as his damages for loss of earnings and earning capacity. Consequently, that assessment was excessive and it was prejudicial error to include all of that amount in the recovery by the judgment. Because of the errors in that and the other respects stated above, the judgment must be reversed and a new trial ordered.

*By the Court.*—Judgment reversed, and cause remanded with directions to grant a new trial.