WALKER, Respondent, v. BAKER and another, Appellants.*

*May 1—June 6, 1961.*

* Motion for rehearing denied, with $25 costs, on October 3, 1961.

For the appellants there was a brief by *Geffs, Geffs, Block & Geffs* of Janesville, and oral argument by *Eli Block*.

For the respondent there was a brief by *Berg & Berg* of Janesville, and oral argument by *Roy E. Berg*.

DIETERICH, J.   This is a left-turn automobile case.  The plaintiff was driving a Volkswagen in a westerly direction, and the defendant, Baker, was driving a 1952 Plymouth in an easterly direction on and along County Trunk A located in Rock county, intending to turn left into his farm driveway on the north side of the highway.  The black-top pavement was approximately 24 feet wide, with a periodic broken yellow line down the center.  On the north side of the road is a seven-foot shoulder and on the south side of the road there is a five-foot shoulder.

The testimony of Hugh J. Lee, Rock county surveyor, is that the graveled apron of the driveway as it joins the black-top pavement measures 30 feet in width and that the roadway as it narrows down to the north is 12 feet wide.

There are two versions of how the accident occurred.  The testimony of defendant, Frederick L. Baker, Jr., is that he put on his left directional signal when he was 200 yards away from his driveway.  He further testified that he saw the Walker Volkswagen when it was at least 250 yards east of the entrance to his driveway and that he started his left turn in a gradual maneuver when he was 35 or 40 feet west of his driveway.  He further testified that when he was 250 yards west of his driveway, his speed was approximately 15 miles per hour.  He testified further (abridged) :

"As I approached and got to the driveway, I was watching the car which was approaching from the east.  I could see

the glow of its lights. As I started to make the turn into the driveway, I could see the lights of the approaching vehicle from the east. At that time the lights of the approaching automobile were in the vicinity of what is designated on the plat as Arnold's driveway, which would be about 250 yards away; they could well have been a bit east of that. I would say that my driveway to the edge of my property is about 200 yards, and the Arnold driveway is another 40 or 50 yards east of that, so that the Arnold driveway would be about 250 yards east of my driveway. The Arnold driveway is where the lights of the approaching car were when I started to make the turn into the driveway; I made my turn into the driveway at a point which would be to the west of what would be the center line of my driveway, and closer to the west edge of my driveway than to the center line of it. The kind of turn I made into the driveway was not a long, gradual turn, nor was it a short, abrupt turn. It was really in between a long, gradual turn and a short turn. As I was making the turn, my blinker light was functioning. As I entered the driveway, I could see the Walker car coming toward us; I didn't feel any concern, and I felt that I had plenty of time to get into the drive, which I did, but Mr. Walker's car veered off the road and came onto the apron of the drive and struck my car."

The plaintiff, Robert Walker, testified (abridged):

"I first became aware of the Baker automobile when I was some distance east of the Baker farm, but I do not know how far away I was from the Baker farm at that time, but it was a considerable distance. At that time I was operating my automobile on the north side of the road, and was operating my car at approximately 50 miles an hour. If I went any faster than 50 miles an hour, the Volkswagen had a tendency to vibrate.

"The highway had a center line, and when I first saw the Baker automobile, that is, the lights of the Baker automobile, I first saw the reflection of the lights at some distance; it was a clear night and the stars were shining; there was no moon; it was a very pleasant fall night. As I continued on the highway, there was nothing that appeared abnormal about Baker's operation of his automobile. Baker was on his own side

of the road, traveling in an easterly direction; I knew there were driveways in the vicinity of the accident, but I did not know where. I had no knowledge of the Baker driveway prior to the accident.

"Both cars continued to approach each other. Baker was still in his lane as we continued toward each other; when I got very close to Baker I observed a very weak blinker light; a very short time after I noticed the blinker light, Baker came into my lane of traffic, and then I immediately hit the brake, and turned toward the side of the road, which was the north ditch; Baker was traveling at a very slow rate of speed, but I could not say how many miles per hour. Just prior to Baker's turning, Baker was traveling very slow.

"I remember talking to a Rock county sheriff's deputy at the scene of the accident; but I was only conscious for a very short period of time; my next recollection was when I was being placed in the ambulance, in which I was conscious for a very short period of time, and my next conscious recollection is in the emergency room in Mercy Hospital; I felt no pain at the scene of the accident, nor until I got to the hospital. The first I noticed any pain is when I was in the hospital room, which was about 3:30 or 4 in the morning."

On cross-examination, Walker testified:

"I saw the Baker car before I hit it. It was a little to my left; I was in my lane of travel, and the last 40 or 50 feet before I hit the Baker car, it was directly in front of me in the westbound lane of travel, and I made no turn to the left at all."

The trial court in the special verdict submitted two questions as to defendant's negligence: (1) As to lookout and turning left, and (2) as to whether such negligence as to lookout and turning left was causal. The jury found the defendant negligent as to lookout and turning left and found such negligence causal. As to the negligence of the plaintiff, Walker, the court submitted lookout, management and control, and the usual causal questions. The jury found no negligence and assessed the total negligence at 100 per cent as to defendant Baker.

*Issues.*

(1) Did the trial court properly refuse to change the answer of the verdict which found Baker causally negligent?

The defendants contend the negligence of the plaintiff as a matter of law was as great as that of the defendant, and further that in any event the credible evidence and the inference to be drawn therefrom compels the conclusion that the defendant was free from negligence.

We find no merit to these contentions because the jury absolved Walker of all negligence and under such circumstances this court must consider all of the material evidence as to how the accident happened from the standpoint most favorable to Walker.

There is ample credible evidence to sustain the finding of the jury that Baker made his left turn directly in the path of the oncoming Walker car under circumstances where a collision was sure to ensue if Walker did not reduce his speed.

On the question of lookout the jury could well conclude that Baker made an improper observation and either misjudged the speed of the oncoming Walker car or else misjudged the distance that Baker had available in which to make the left turn. *Henthorn v. M. G. C. Corp.* (1957), 1 Wis. (2d) 180, 83 N. W. (2d) 759, and *Ruid v. Davis* (1959), 8 Wis. (2d) 288, 99 N. W. (2d) 129.

(2) Did the trial court err in refusing to submit a requested question in the verdict as to whether plaintiff was negligent as to speed?

There is no evidence that Walker was going in excess of 55 miles per hour before he observed the activated directional left-turn lights of the Baker car, and his failure thereafter to reduce his speed became a matter of management and control and not of speed. *Jennings v. Mueller Transportation Co.* (1955), 268 Wis. 622, 68 N. W. (2d) 565.

(3) Did the trial court err in refusing to submit a requested instruction as to the plaintiff's negligence as to op-

erating his automobile with an obstructed view through his windshield?

While there is testimony that Walker had a pair of plastic dice suspended over his windshield, there is no evidence that this interfered with his vision, and it would be pure speculation on the part of the jury so to find. The trial court properly refused to submit the requested instruction as to this aspect of the case.

(4) Was the trial court's instruction to the jury improper, prejudicial, and an inaccurate statement of the law?

The defendants challenge the following instruction given to the jury with respect to the questions of the verdict relating to whether Walker was guilty of negligence as to management and control:

"When the driver of a vehicle approaching a private drive and intending to turn left therein indicates his intention to turn by turn signal, the duty of a vehicle approaching in the opposite direction and intending to continue straight forward on his own side of the road is not necessarily bound to alter his speed or stop on the giving of the turn signal. Depending on the circumstances present and the conduct of the driver about to turn left, the driver going straight ahead may have the right to assume that the driver about to turn left would slow down or stop to permit the vehicle intending to go straight ahead to pass. If the conduct of the driver intending to turn left did not indicate he would slow down or stop to permit passage of the vehicle going straight, you may find that the driver going straight ahead, in the exercise of ordinary care, should slow down to permit the left turn."

We find no error in such charge. Cf. *Behringer v. State Farm Mut. Automobile Ins. Co.* (1959), 6 Wis. (2d) 595, 599, 95 N. W. (2d) 249.

(5) Did the trial court err in refusing to permit the defendant Baker to read in excerpts from his own adverse examination to explain answers previously read into the record by the plaintiff?

The party whose adverse examination has been taken does have the right to read in excerpts of such examination to explain questions and answers read to the jury by the opposing side. However, such explanatory questions and answers should be offered immediately after the reading of the questions and answers sought to be explained. In the instant case, just prior to resting the plaintiff's case, counsel for plaintiff read certain questions and answers from the adverse examination of the defendant and offered them in evidence. At that time the defendants' counsel did not read the questions and answers to clarify the questions read by the plaintiff, which he had a right to do. Not having exercised this right, it was discretionary with the trial court to allow the defendants to read the questions and answers later in the trial. Some four witnesses later, the defendants requested to read questions and answers in clarification of those previously read by the plaintiff. There was no abuse of discretion in the trial court's denying the right to read such explanatory questions and answers at this stage of the trial.

(6) Are the damages excessive?

Question 6 of the special verdict is as follows:

"What sum of money will fairly and reasonably compensate Robert F. Walker for:

"(a) His personal injuries? Answer $22,500.

"(b) His past medical, dental, and hospital expense? Answered by the Court: $4,375.30.

"(c) His future medical, dental, and hospital expense? Answer: $6,500.

"(d) His wage loss to date? Answer: $5,748.

"(e) His future wage loss? Answer: $4,160."

The medical testimony discloses that Walker's injuries consisted of two broken thigh bones, fractured right knee, and fractured jaw. The first surgery was performed on his right thigh about a week after hospitalization. The jaw surgery was performed a week later. Prior to the jaw surgery,

Walker could not chew, sneeze, cough, talk, or move his jaw without having considerable pain.

He was discharged from the hospital November 27, 1958, on crutches and with a cast on his right leg. After leaving the hospital he went to live with a Mrs. Dolgner and remained there until March, 1959. His physical condition required assistance in getting up or down, dressed and undressed. Walker had to eat soft food because of the jaw's being wired and he was in constant pain. Therapy treatments were administered immediately upon his discharge from the hospital and continued until his second hospitalization. He was on crutches for a little over six months after his first hospitalization. The second hospitalization was from October 1, 1959, to October 14, 1959, for the removal of the steel rods in both legs and the steel wires wrapped around the bone. The second surgery likewise required the continued use of crutches and therapy treatments.

He was released by his doctor for work on May 16, 1960, and although he attempted to go back to his regular employment as a painter, he was unable to handle the work. He found employment on May 25, 1960, as an operator of a knitting machine.

The testimony of Dr. Paul Odland, an orthopedic surgeon, is that the plaintiff was examined by him on October 5, 1958. The X ray and examination revealed a retraction of the lower jaw and a lateral fracture of the temporal mandibular joint or condylar region, a comminuted fracture of the right femur, fracture of the right patella, and fracture of the left femur.

The patient was kept in traction to stabilize his condition. On October 9, 1958, an operation was performed on the right leg under a general anesthesia and consisted of cutting through the muscles of the thigh to the bone inspecting the fracture, lining it up properly, and then inserting a rod down the middle of the bone to stabilize the fracture and then

putting small wires around the bone to hold it in position. Surgery took two hours and twenty minutes and the patient received blood during the surgery.

The operation on the left leg was thirteen days later, October 22, 1958. The patient received blood and the operation took two hours and twenty-five minutes. It was performed under general anesthesia and required an incision on the side of the thigh and one on the left hip. Laboratory tests were made because of his loss of blood due to the fracture of both thighs which caused hemorrhaging. The tests that were made were for the purpose of determining how long surgery would have to be delayed and what amount of blood plasma would be required in order to build the patient up. During the thirteen days his left leg was in traction. The doctor testified that the operations on the legs were complicated because it required the handling of both limbs during each operation.

The fractured patella first had a splint on and a full cast was applied on November 10, 1958, while Walker was in the hospital. On November 11, 1958, the elastics were removed from his jaws.

Walker was kept at bed rest until the fractures were supple enough to allow exercise. He began exercising November 2, 1958, and was able to stand November 11, 1958, and then gradually went to crutches. Narcotics were administered every day until October 31, 1958. He was discharged from the hospital wearing crutches and a cast on the right leg on November 27, 1958, and remained on crutches until February, 1959, though the cast had been removed. He could not open his jaw satisfactorily. He had a painful right hip and restricted right knee and continued to have therapy and exercise.

On October 1, 1959, the rods in each of his two legs were removed. Incisions were made in the identical areas as before. The fractures were inspected and the wires wrapped

around the bones were removed. The operation took two and a half hours under general anesthesia.

He was hospitalized until October 14, 1959. Upon his release he was returned to crutches for three or four weeks and then resumed therapy treatments.

Walker has restricted motion in his right knee and can bend it only 90 degrees. This restriction is permanent. He will have permanent injury to his thighs. The doctor stated: "He has two surgical patches through the muscle layers to the thighs, which usually results in some weakening . . . in addition . . . both hips have failed to respond to exercising, walking and so on; it is likely the gluteal power in both hips is reduced to 85 per cent of the normal." His limbs are of unequal length and he has atrophy of the right thigh. The doctor's measurements show that the right femur measures 47.9 centimeters and the left 48.4 centimeters.

On May 16, 1960, the doctor advised him to seek work. He could not do any jobs which required climbing, prolonged walking, prolonged standing, squatting down, getting up from low to erect positions, lifting, or any jobs that are not done on a level surface.

Dr. Austin F. Sipple, a specialist in oral surgery, examined Walker on October 15, 1958. Walker's jaw was to the left a malocclusion of half centimeter and retracted a centimeter. This condition would cause and produce considerable pain. The fracture was reduced by surgical procedure which consisted of fitting a bar up around the teeth on both jaws under general anesthesia and lashing the bars into position by wires. The bars have hooks on them and from these hooks rubber bands are placed. Walker's jaw had no treatment for ten days and he was in pain. He could not move the jaw. His jaw was wired for four weeks and during this period he could eat only liquids. The operation was difficult. The operation took a couple of hours. It was difficult to reduce.

It was a difficult case and not the easiest thing in the world. When the wires were removed, this jaw was retracted. It was a normal recovery. He can open his mouth the width of one finger. This condition is permanent.

It can be rectified by very difficult specialized surgery. It is a complicated operation and takes two hours on each side of the mouth and must be done by one with a dental degree, medical degree, and a doctor's degree in surgery. It would consist of removing the articulatory surface of the lower jaw, making an external opening on either side and dissecting out the joints. He would be hospitalized for one month. Dr. Sipple has handled or assisted on at least 10 of these operations. His prognosis without this surgery is grim and his prognosis with the surgery is grim.

Dr. Sipple handled six to 10 of these cases last year, six one year, and 20 another year. He further testified that the cost of such an operation would be very expensive, but could not say how much.

Dr. Robert H. Agard, licensed dentist of thirteen years, testified as to the problem of taking care of his teeth and resultant loss of teeth due to lack of care and difficulty in caring for them properly. He stated that it would be difficult to fit dentures, because of the little space into the mouth due to his mouth's having a total opening of only one inch. Many appliances that would be required to be used in connection with the replacement by denture would require specialized technique. He further testified that the operation of removing the condyles and mandible might alleviate Walker's condition. It would be expensive and Walker would be incapacitated from three to six months. In that way they would be able to move the jaw and get proper movement of the jaw. He further testified that he had no opinion to express as to the expense of the operation, except that it was very expensive. He further testified that the cost

of the dental care during Walker's lifetime would be approximately $5,000 (to age sixty-five). If Walker's jaws were normal and he could open his mouth wide, conservatively he would spend somewhere around $1,000 in the next fifty years in care of his teeth.

The testimony and record reveal that the plaintiff suffered severe injuries and there is ample credible medical testimony to sustain the jury's award for personal injuries, wage loss, and future wage loss, and the amount allowed by the court for past medical, dental, and hospital expenses.

The defendants contend that while the court instructed the jury as to the life expectancy of the plaintiff, it neglected to also instruct the jury that in making a present award for a period of future years, it should determine the present value of that award. If the defendants had requested the instruction embodying the principle stated in *Kramer v. Chicago, M., St. P. & P. R. Co.* (1937), 226 Wis. 118, 135, 276 N. W. 113, it would have been error on the part of the trial court not to give it. However, in the absence of such request it was not prejudicial error on the part of the trial court in failing to include and give such instruction.

The jury's award for future medical, dental, and hospital expenses in the amount of $6,500 cannot be sustained unless on the basis of the testimony of the oral surgeon of likely future dental bills if the plaintiff Walker does not submit to the operation so as to correct the present inability to open his mouth beyond the limitation previously described. In such event, he would spend somewhere around $5,000 in the next fifty years in the care of his teeth, or $4,000 more than would be the case if he could open his mouth normally.

The burden of proving the actual cost of future medical expenses is upon the plaintiff. *Sawdey v. Schwenk* (1958), 2 Wis. (2d) 532, 87 N. W. (2d) 500. The only items so proved in this case were that of $760 maximum for the knee operation and $4,000 additional dental expenses over the

plaintiff Walker's lifetime if he does not elect to have the expensive operation performed on his jaw. Thus the maximum total damages for future medical expenses actually proved is $4,760 or $1,740 less than the $6,500 awarded by the jury therefor and included in the judgment.

This will necessitate that the plaintiff be given the option of remitting $1,740 of the total judgment against the defendant Baker, or that the judgment against such defendant be reversed and a new trial directed only as to such item of future medical expenses. In the event the plaintiff fails to exercise the option to remit the $1,740, and the judgment against the defendant Baker is reversed, the other items of plaintiff's damages found by the jury and approved herein shall be included in the new judgment to be entered against the defendant Baker upon completion of the new trial with respect to damages for future medical expenses.

(7) Did the trial court commit error in admitting photographs of the plaintiff purportedly to show his physical condition soon after the accident?

It would have been better if the trial court had not included the photographs, especially the one showing the plaintiff's teeth with the wired jaw, as such photographs might tend to inflame the jury. However, the admission of photographs is largely a question which is left to the discretion of the trial judge, and in view of the fact that the condition and the manner in which the fracture was treated were adequately described by the medical testimony, we find no abuse of discretion on the part of the trial court in admitting the photographs.

(8) Was the argument of plaintiff's counsel to the jury improper and prejudicial?

The alleged misconduct of plaintiff's counsel was in telling the jury, "I am asking you to consider $25,000." This was not an improper argument to the jury under the rule adopted by this court in *Affett v. Milwaukee & S. T. Corp.* (1960),

11 Wis. (2d) 604, 613, 106 N. W. (2d) 274. In that case this court said:

"The present rule for measuring damage is as fixed as the nature of the subject matter will permit. True, counsel should be entitled to a reasonable latitude in argument and in commenting on the evidence, its nature and effect, and may make proper inferences which may reasonably arise from the evidence."

*By the Court.*—If the plaintiff will file in this court within twenty days from the date of this opinion his election to remit $1,740 from the damages recoverable against the defendant Frederick L. Baker, Jr., such judgment will be reduced from $44,031.36 to $42,291.36, and, as so modified, will be affirmed. Otherwise, that part of the judgment recoverable against the defendant Baker will be reversed, and the cause remanded for a new trial limited to the issue of damages for future medical expense only. The judgment against the defendant Northwestern National Casualty Company is affirmed. The plaintiff shall be entitled to tax costs on this appeal against the defendant Northwestern National Casualty Company but not against the defendant Baker.