JOHN BORZEA,

*Plaintiff and Respondent,*

vs.

DON R. ANSELMI and WILLIAM DICKSON,
*Defendants and Appellants.*

(No. 2583; June 16th, 1953; 258 Pac. (2d) 796)

For the defendants and appellants the cause was submitted upon the brief of J. R. Armstrong of Rawlins, Wyoming; Edward E. Murane of Casper, Wyoming;

and Glen C. Stanton of Rock Springs, Wyoming, and oral argument by Mr. Murane and Mr. Stanton.

For the plaintiff and respondent the cause was submitted upon the brief and also oral argument of Albert E. Nelson and Kenneth G. Hamm both of Rock Springs, Wyoming.

## OPINION

BLUME, Chief Justice.

This is an action brought by the plaintiff against the defendants, who were partners, to recover damages occasioned by reason of the fact that on January 24, 1950, a Mercury automobile driven by Anselmi from

east to west collided with the body of plaintiff severely injuring him. The case was tried at Rawlins, Wyoming, with a jury in attendance pursuant to a change of venue from Sweetwater County to Carbon County. The jury returned a verdict in favor of the plaintiff in the sum of $36,867.05. Underneath the signature of the foreman appears the following: "A. $1,867.05 for hospital and medical and professional care. B. $5,000 for pain suffering, mental anguish, fright, in conveniences and damage to nervous system. C. $30,000 for permanent disability resulting in the loss of past, present and future earnings." The defendants have appealed the case to this court.

The plaintiff in his amended petition alleged the partnership of the defendants herein and set out specifically the various injuries sustained by plaintiff, including temporary and permanent injuries received by the plaintiff; and that plaintiff was compelled to pay out the sum of $1,867.05 for hospital, medical and other care. Plaintiff pleaded certain provisions of the ordinance of the town of Rock Springs, in which town the injuries herein were sustained. Among these provisions is one which provides that in the district in which the plaintiff lived no car should travel at more than 20 miles per hour and that an automobile travelling at 20 miles per hour should be able to stop at 25 feet, if travelling at 30 miles per hour to stop at 56 feet. Plaintiff alleged that Anselmi carelessly and negligently drove the car at an excessive speed namely, in excess of 20 miles per hour, contrary to the ordinances of the city. He specifically alleged (c) that Anselmi negligently and carelessly drove and operated said Mercury automobile at said time and place without due regard for the rights and safety of pedestrians crossing said 9th Street, in that, he failed to decrease the speed of said Mercury automobile, or to keep a proper lookout

for pedestrians crossing said street; (d) that Anselmi negligently and carelessly drove and operated said automobile, in that, he disregarded, or failed to observe, plaintiff proceeding in a southerly direction across said 9th Street; (e) that Anselmi drove and operated said automobile negligently and carelessly, in that, he failed to keep said automobile under proper control so as to avoid striking and colliding with plaintiff crossing said street; (g) that Anselmi negligently and carelessly failed and neglected to decrease the speed of, or apply the brakes on said automobile so as to avoid colliding said automobile with the body of the plaintiff; (h) that Anselmi negligently and carelessly failed to turn said automobile to the right so as to avoid colliding said automobile with the body of the plaintiff. Plaintiff further alleged: "That all of the afore-mentioned acts of negligence and carelessness on the part of said defendants combined, concurred and were the proximate cause of the injuries to plaintiff."

The defendants in their answer generally denied the allegations of the amended petition and also pleaded contributory negligence on the part of the plaintiff. This allegation of contributory negligence was denied by the plaintff in a reply.

The plaintiff, who was a coal miner, lived approximately in the middle of two blocks in question here and on the south side of 9th Street in Rock Springs, which is also part of the Lincoln Highway. These blocks are of the unusual length of 1094 feet with no crossings except at the end of the blocks. There was no sidewalk on the south side of the street but there was a sidewalk on the north side. On the day in question, the plaintiff left his home about 2 o'clock in the afternoon in order to go to work in a mine situated northeasterly from where he lived. He, as was his custom and that of others, crossed 9th Street from the south to the north

in order to walk along on the sidewalk on the north side of the street. He walked for a short distance easterly when his son, Patrick Borzea, who was driving a car easterly honked in order to pick the plaintiff up and drive him to work. The son parked his car at the south curb, a short distance east of where plaintiff was then walking. Plaintiff continued to walk eastward until he was about opposite of the place where his son's car was parked. He then proceeded to cross the street to the south in order to get into his son's car. When he had proceeded about 18 feet in crossing the street, he was hit by the left front fender and left front headlight of the Mercury car driven by the defendant Anselmi, who came from the east and was travelling west. Plaintiff was thrown onto the street, perhaps dragged along by the car for a number of feet, and was severely injured. He was bleeding profusely when carried to the south curb. He was taken to the hospital at Rock Springs where he remained apparently for about four months. He was there treated by Dr. Prevedel. That physician testified that plaintiff had bruises over his whole body. He suffered from a fractured left femur around the knee joint. He complained of severe left side chest pain; he was short of breath, his pulse was rapid; he had a cut over his left eyebrow. X-rays were taken and it was found that plaintiff had a fractured leg, so it was splinted. Two to four days later plaintiff complained of severe chest pain. An X-ray was taken, which revealed that plaintiff was suffering from a diaphragmatic hernia with parts of the abdominal contents in his chest, which caused shock and strangulation. A further X-ray revealed a linear fracture of the third lumbar vertebra in the small of his back. Plaintiff's leg was put in a cast. He was subsequently taken to Salt Lake City for treatment by Dr. Howard, assisted by Dr. Prevedel. The chest cavity of plaintiff was opened on the left side. "We found a

large rent or hole in his diaphragm * * * an organ or a muscle that separates the chest from the abdomen * * * which measured approximately six inches in diameter which contained approximately one-half of his stomach and a portion of his large bowel, which was adhered and scarred to the left lower lobe of his lung. This was all freed and placed down in position to his abdominal cavity and the defect sewed back together." In the process the 9th rib had to be removed. The plaintiff continued to be under the care of a physician. He went to Lava Hot Springs, and to the springs in Thermopolis, seeking relief from this condition. But he continued to have pains up to and at the time of the trial herein. Dr. Prevedel made a further examination of plaintiff on April 12, 1952, shortly before the trial in this case. He testified that the plaintiff had then reached his maximum recovery; that he complained of persistent left side and chest pain; he had approximately an 80 degree limitation of full abduction of his arm; he could not touch his left ear with his arm; he had weakness of his entire shoulder girdle—the collar bone, shoulder joint and scapula. Those muscles were definitely weak which showed evidence of wasting of the muscles. Plaintiff complained bitterly upon forceful motion of his shoulder joint. His left leg was left approximately one inch shorter than his right. He also showed some wasting of the muscles of his thigh, approximately one inch difference between both legs. He was unable to completely extend his left knee, with around 10 degree limitation of full extension. He has a lot of residual pain. "It comes from two things, from removal of the rib and, of course, on each side of the rib is a nerve, the costal nerves, the costal nerves are imbedded in scar tissue and when nerves are caught in scars they become very painful and after, say, a year and a half to two years when the pain still persists probably another operation has to be performed to cut

the nerve in the scar tissue to free the man from pain."
The physician further testified that the plaintiff was
totally disabled from performing any manual work,
although he might be able to act, for instance, as a
watchman.

Anselmi testified that he drove from 15-20 miles per
hour; that he first saw plaintiff when some 17-20 feet
away; that plaintiff was running, and darted from in
front of Mrs. Crowley's car parked at the north curb,
looking neither to the right nor to the left; that when
plaintiff finally saw his (Anselmi's car), he "froze" in
his tracks, and that if he had continued going he would
not have been hurt; that he, Anselmi, stopped his car
within about five feet after the impact. His testimony
was disputed by plaintiff and other witnesses. Mrs.
Crowley testified that there was no traffic on the street;
that she first saw Anselmi's car when about even with
her own car—standing some 20-30 feet east of where
plaintiff was crossing—that this was just a "second"
before the impact. How far east she had been looking,
or how far east she could see does not appear. She
stated that the Anselmi car travelled four to five car
lengths (about 64-80 feet) after the impact. She saw
the plaintiff crossing the street, and he "was looking
in front of him." Patrick Borzea, the plaintiff's son
testified that when he parked his car at the south curb
of the street, he did not see any approaching car from
the east. How far east he was able to see does not
appear. He also stated that the Anselmi car stopped
within about 50 feet or a little more after the impact.
He and the defendant Anselmi picked up the plaintiff,
when the latter was injured, and took him to the south
side of the street, called an ambulance, and plaintiff
was then taken to the hospital. The chief of police of
Rock Springs was called and he interviewed Anselmi
and Patrick Borzea at the hospital. He asked the latter

whether or not Anselmi was driving too fast, and Patrick answered: "No. Dad stepped in front of the parked automobile." That conversation was denied by Patrick Borzea. Anselmi testified that Patrick said further that it was all his father's fault. That testimony was stricken. Further facts will be stated as we proceed to consider the various questions involved in the case.

1. Contributory Negligence.

The point most strenuously urged by appellants is that the plaintiff herein was guilty of contributory negligence as a matter of law and ought not to recover herein. A multitude of cases on the subject are cited by the appellants as well as by the respondent. Counsel for appellants argue that in view of the sympathies of a jury for a plaintiff in a case such as before us, the court ought to protect the defendant *vigorously* when contributory negligence appears. We are not at all certain that courts go to that extent. A rule of law which absolves a negligent defendant from all responsibility when there is contributory negligence, even though slight, cannot be said to be altogether humanitarian. Hence, courts have cast the burden of proof of contributory negligence, speaking generally, on the defendant (Restatement of the Law of Torts, § 477; Johnston v. Vukelic, 67 Wyo. 1, 213 P. (2d) 925) and as shown in the recent case of Templar v. Tongate, Wyo., 255 P. (2d) 223, they will not hold that the question of negligence or contributory negligence is one of law except in the clearest case. Palpable negligence on the part of a plaintiff should not, of course, be forgiven any more than palpable negligence of a defendant, and it may be that a rule such as applicable under the Federal Employers Liability Act which seeks to apportion the fault—though that is difficult to do— might to some extent at least cause juries to keep their

sympathy for an injured plaintiff within reasonable bounds. However, we do not have that Federal Law and must decide the case under rules of law as we find them.

We have examined the testimony on the point here considered a number of times and critically. A car belonging to Mrs. Crowley was parked near the place where plaintiff crossed the street south to get into his son's car. Anselmi testified as heretofore stated that plaintiff crossed right in front of the Crowley car. Other testimony however shows that the car was standing about 20 to 30 feet east of where plaintiff crossed. Plaintiff testified that his view was blocked, and counsel for defendants make much of that point. We cannot tell just what plaintiff meant. But taking the testimony as a whole, it clearly means that the view was obstructed only to a limited extent. Plaintiff testified that while crossing the street he took six steps which took him 5 seconds to reach the place where he was hit by the Anselmi car, which was about $1\frac{1}{2}$ feet from the center of the street, the street being 39 feet wide from curb to curb, so that he was hit after he had walked about 18 feet in crossing. He stated definitely that he looked east before or at the time that he started to cross and saw no oncoming car from the east—the direction from which the Anselmi car came. He looked, as he stated, east once and then looked west, and looked east again just at the time when he was struck by the Anselmi car, being hit by the left front fender and left headlight of the car. His testimony as to what he was able to see when he started to cross the street is confusing to us and apparently contradictory. At one time he stated that when he was standing on the curb he was able to see to the east as far as the eye could reach (Q. 565) which does not seem improbable. Again he apparently testified that he was able to see 250 feet

east (Q. 574, 577). This, too, does not seem improbable. In answer to five or six different questions, he testified that when he was taking the first step to cross the street, he was able to see 150 feet, but no further and that no travelling automobile was in sight coming from the east. (QQ. 245, 249, 730, 737, 741, 742.) As far as we have made observations ourselves, we are unable to say that the jury were not justified in crediting this testimony. This latter testimony is that relied on by counsel for the plaintiff and seems to represent the actual facts, from plaintiff's standpoint, as to what the plaintiff saw and was able to see when he started to cross the street to go to his son's car. The witness apparently was standing and was constantly pointing to a map in evidence. These pointings are not before us, as they were before the jury, and it may be that what appear as contradictions to us, were perfectly reconcilable to the jury.

In 2A Blashfield Cyc. of Automobile Law and Practices, p. 280, § 1412, the author states: "Thus a pedestrian, who sees an automobile approaching, may calculate upon passing in front of it, upon the assumption that it will approach at a lawful rate of speed, and, if he observes no vehicles on the street within a distance which would be covered by vehicles operating at a lawful speed, he may proceed on the assumption that all vehicles outside of such distance will not run at an unlawful speed." We applied that rule in Ries v. Cheyenne Cab & Trans. Co., 53 Wyo. 104, 79 P. (2d) 468. Again it is stated in 2A Blashfield, supra, § 1472, pp. 362, 363, 364, 365: "* * * reason supports the rule, affirmed almost everywhere, that, under the duty of exercising ordinary care, a pedestrian, after he has entered upon a street crossing in a prudent manner, is not required as a matter of law to be constantly on the lookout for danger, or to constantly look or listen for

approaching motor vehicles, under the penalty that a failure to do so shall be chargeable against him as contributory negligence precluding recovery for injuries which may be sustained through the negligence of a motorist. He is not required to rivet his eyes on an approaching automobile, and his care is not to be determined solely by the fact that he was struck and was not at that second looking at the automobile."

Counsel for the plaintiff argue that under these rules of law, plaintiff was not negligent, at least as a matter of law, by looking to the east only once; and that he had a right to assume that Anselmi would drive only at the rate of 20 miles per hour, as prescribed by the ordinance of Rock Springs. They further argue that had Anselmi driven at that rate the car, covering 29.33 feet per second, should have been east of the place where and when plaintiff was hit some 27.79 feet. That is based on the theory that the plaintiff looked and did not see Anselmi's car 150 feet distant *after* he had taken one step from the curb. The testimony on that point is as follows: Answer to Q. 599: "When I first stepped from the sidewalk, the first foot I looked eastward and started walking. Q. 729. Now at the same time did you look to the left of the car? A. I did when I made the first step, I looked to the left side." Answer to Q. 742: "When I started into the street, when I make the first step to see—I see 150 feet—I could see 150 feet after the first step from the sidewalk. Q. 745. In other words you took one step off the curb and you saw 150 feet down the street. A. Yes, sir."

It may be noted that the testimony is contradictory or at least not quite harmonious. Plaintiff apparently meant at one place that he looked as he was starting to cross the street; again that he looked *after* he had taken the first step—that is to say that after he had left the curb a distance of three feet. Now we cannot

assume that the Crowley car was parked three feet south of the curb, though it may have been parked, say, one foot away. Hence, if it is true that plaintiff looked after he had taken the first step, the only way he could have seen 150 feet east was through the windows of the Crowley car. But that is inconsistent with his testimony. He stated: Q. 568: "Well, could you see through the car? A. I see along side, right-hand side of the car, along side of the car. Q. 725. Now which side of the car were you looking around when you could see the easterly part of the street? A, I was looking on the north side of the (Crowley) car."

It would seem that plaintiff looked and did not see Anselmi's car just as he was stepping from the curb, if he looked at all. It took plaintiff, as he testified, 5 seconds to reach the point of impact. A car travelling at 20 miles per hour, or 29.33 feet per second, and 150 feet distant would have travelled 146.65 feet during that time, or within 3.35 feet from the point of impact. That is figuring too closely, and tempting the fortunes of chance. And plaintiff's estimate was at best approximate. The Anselmi car might have been 160 feet away, but so far as plaintiff knew it might have been only 140 feet away. We do not mean to say that a man who stands at the curb of a street and sees another car coming at his side of the street in clear view 150 feet away, or approximately half of an ordinary block, is negligent at least as a matter of law. But as the plaintiff stepped forward from the curb and walked for six to seven feet, the Crowley car which was about six feet wide must have obscured his vision, partially, at least, so that ordinary prudence would seem to have dictated that he should have stopped and looked east before he took the third or fourth step. We need not, however, go so far as to hold in the light of what is stated hereafter that plaintiff was negligent as a matter

of law, though we think that the point is a close one.
2. Last Clear Chance.

It is doubtful that the jury decided this case on such close figuring as counsel for plaintiff have made. It is more likely that they decided the case as they did on the ground that Anselmi's speed was too fast; that he failed to keep a proper lookout, as pleaded in the amended petition; that he could have seen the plaintiff's position of peril had he looked, and that he failed to stop his car when he should have done so. They probably applied the rule well stated in the case of Dunn Bus Service v. McKinley, 130 Fla. 778, 178 So. 865, 867, 868, quoting from a previous case as follows: " 'The party who last has a clear opportunity of avoiding an accident, notwithstanding the negligence of his opponent, is considered solely responsible for it. Such is a simple statement of the doctrine of "the last clear chance." The *last clear chance* doctrine is not an exception to the general doctrine of contributory negligence. It does not permit one to recover in spite of his contributory negligence, but merely operates to relieve the negligence of a plaintiff or deceased in a particular instance, which would otherwise be regarded as contributory, from its character as such. This result it accomplishes by characterizing the negligence of the defendant, if it intervenes between the negligence of plaintiff or deceased, and the accident, as the sole proximate cause of the injury, and the plaintiff's antecedent negligence merely as a condition or remote cause. The antecedent negligence of the plaintiff or deceased having been thus relegated to the position of a condition or remote cause of the accident it cannot be regarded as contributory, since it is well established that negligence, in order to be contributory, must be one of the proximate causes.' "

The rule is stated in the Restatement of the Law of Torts, § 479, p. 1253, as follows:

"A plaintiff who has negligently subjected himself to a risk of harm from the defendant's subsequent negligence may recover for harm caused thereby if, immediately preceding the harm,

(a) the plaintiff is unable to avoid it by the exercise of reasonable vigilance and care and

(b) the defendant
    (i) knows of the plaintiff's situation and realizes the helpless peril involved therein; or

    (ii) knows of the plaintiff's situation and has reason to realize the peril involved therein; or

    (iii) would have discovered the plaintiff's situation and thus had reason to realize the plaintiff's helpless peril had he exercised the vigilance which it was his duty to the plaintiff to exercise, and

(c) thereafter is negligent in failing to utilize with reasonable care and competence his then existing ability to avoid harming the plaintiff."

It does not appear whether the Crowley car, six feet wide, was parked right up against the curb. Possibly it was parked a foot from the curb. Then when plaintiff had walked south, in crossing the street (even though right in front of the Crowley car) a distance of seven feet or more, his vision and Anselmi's would thereafter be unobstructed, that is to say when the plaintiff had left the curb and had taken 3 steps (had walked a distance of 9 feet) the vision for plaintiff as well as Anselmi was clear, each being able to see the other without any obstruction of any kind. Since however, the plaintiff was looking west, instead of east, and was not negligent as a matter of law in doing so, he may well be said to have been in a situation in which he was unable to avoid the threatening harm, as re-

quired by the foregoing rule. Since it took the plain-
tiff, as he testified, 5 seconds for six steps, one step
took 5/6th of a second, three steps (9 feet) took 15/6th
or 2½ seconds, leaving, while plaintiff walked the re-
maining distance of 9 feet to the place where he was
hit, a period of 2½ seconds, during which Anselmi had
a clear view of the plaintiff and during which time as
hereafter shown, Anselmi could, or should, have dis-
covered the peril in which the plaintiff was.

Assuming the truth of the testimony that plaintiff
while walking to cross the street took six steps and
consumed five seconds before he was hit, the claim of
appellants that plaintiff darted from in front of the
Crowley car just when Anselmi reached close to (some
17-20 feet from) the place of the impact can be demon-
strated mathematically to be incorrect. The evidence
does not directly show as to how far east the Anselmi
car was when plaintiff came into clear view of Anselmi.
But, under the same assumption, it can be shown
mathematically how far east he actually was. The
distance that plaintiff walked is known, namely a total
of approximately 18 feet—when he was hit. As stated
above, he came into clear view of Anselmi at least 2½
seconds before he was hit. During the 2½ seconds the
Anselmi car was travelling. It was not standing still.
And during that 2½ seconds it travelled through and
from a distance east of the line of impact depending
on the rate of speed. If Anselmi travelled at 20 miles
per hour, or 29.33 feet per second, he must have been
east of the line of impact when plaintiff came into clear
view approximately 63.32 feet; if Anselmi travelled at
the rate of 30 miles per hour, or 44 feet per second, he
must have been east approximately 110 feet. The plain-
tiff may have been wrong when he testified that he
took only six steps in walking 18 feet when he was hit.
That would be taking long steps for a man 5 feet 6

inches tall—the height of plaintiff. Let us assume that he took 7 steps. He would then have walked 2 and 4/7th feet in one step, and 7 and 5/7th feet in three steps. That would have put him into clear view of Anselmi. It would have taken him 2 1/5th seconds, giving a little more time than that heretofore stated during which he was in clear view of Anselmi. The situation would not have been much different if he had consumed 6 seconds instead of 5 while he was crossing.

An ordinance of the city of Rock Springs, as heretofore stated, provides that a motorist travelling at 20 miles per hour must be able to stop his car at 25 feet; if he travels at 30 miles per hour, he must be able to stop at 56 feet. Had Anselmi complied with this ordinance, the plaintiff would not have been injured. We think we should, however, in this connection not fail to mention the fact that the Highway Department of this State distributes booklets and pamphlets showing the distance in which a motorist should be able to stop. They differ to some extent. If he travels at 20 miles per hour, he should be able to stop in, and ranging from 40 to 49 feet; if he travels at 30 miles per hour, he should be able to stop in, and ranging from, 70 to 93 feet. The tables recognize a so-called reaction period —a period elapsing from the time that a motorist makes up his mind to stop until the brake is actually applied. If these estimates are correct, and we think they are, the ordinance of Rock Springs on this point is unreasonable. However, the question of negligence is ordinarily one for the jury, and though we are not free from doubt, the point does not appear to be so entirely clear as to justify us in holding that the jury were not warranted, even under these higher estimates, in finding that Anselmi should have observed the plaintiff's position of peril, and that he could, and should, have stopped in time to have avoided the impact with

plaintiff. In other words, speaking hesitantly, we cannot say that they were not warranted in finding that the allegations of the second amended petition are true, which among other things alleged that Anselmi failed to keep a proper lookout for the plaintiff, failed to stop his car in time to avoid the collision, and failed to at least swerve his car to the right in time to prevent hitting the plaintiff.

3. Instruction as to Present Value of Future Suffering.

The court, in Instruction No. 24, instructed the jury as to compensation for pain and suffering as follows: "You are further instructed that there is no fixed standard as to any amount to allow for pain and suffering. That is to be guided by your good judgment. You should carefully consider the testimony in the case and see what you think the pain and suffering, if any, of the plaintiff are worth." The instruction does not distinguish between past and future pain and suffering, and so must be considered as including both. It is contended that the court should have instructed to reduce future suffering to present value. An annotation on the subject is contained in 28 A.L.R. 1177; see also 154 A.L.R. 801. Some of the courts seem to regard such an instruction proper, but we do not find that failure to give it, especially in the absence of an instruction asked, is reversible error. There is no standard by which such future pain and suffering may be measured, so it is difficult to see how a reduction to present value may be made. In Chicago & Northwestern Ry Co. v. Candler, 283 F. 881, 28 A.L.R. 1174, it was held that an instruction to reduce future pain and suffering to present worth was properly refused. In Pennsylvania, the courts have steadily adhered to the rule that present worth has no applicability to future pain and suffering, and to give an instruction that it should be so reduced is erroneous. Yost v. West Penn. Ry., 336 Pa.

407, 9 A (2d) 368; Renner v. Sentle, 151 Pa. Super. 231, 30 A. (2d) 220. To the same effect in Louisville N. R. Co. v. Bean, 49 Ga. App. 4, 174 S.E. 209. In the annotation covering this subject in 154 A.L.R. 809, it is stated that the weight of authority is against the reduction of damages such as here considered to the present worth.

Counsel further complain that the instruction made no reference to mortality tables. While it might have been better to refer to them directly, the court directed the jury to carefully consider the testimony in the case. The mortality tables were introduced in evidence and may, in a broad sense, well be considered as part of the testimony in the case. Furthermore, the court directed the jury's attention to the mortality tables in another connection, as will be noted presently, so that the jury could not fail to take them into consideration. The objections here considered are overruled.

4. Reasonable Certainty of Future Pain and Suffering.

Defendants contend that in any event the evidence should show any future pain and suffering with reasonable certainty. And they asked the court to give Instruction No. A reading as follows: "You are not permitted to award plaintiff speculative damages, by which term is meant compensation for prospective detriment which, although possible, is remote, conjectural or speculative. However, should you determine that the plaintiff is entitled to recover, you should compensate him for prospective detriment if it has been shown by a preponderance of the evidence that there is such a degree of probability of that detriment occurring as amounts to a *reasonable certainty* that it will result from the original injury." The court refused to give that instruction and an exception was allowed to the defendant. Instead of giving the asked instruction the

court gave Instruction No. 28 in almost the identical language as Instruction No. A, except the last sentence. The instruction given reads as follows: "You are not permitted to award plaintiff speculative damages, by which term is meant compensation for prospective detriment which although possible, is remote, conjectural or speculative. However, should you determine that the plaintiff is entitled to recover, you should compensate him for prospective detriment if it has been shown by a preponderance of the evidence that there is such a degree of probability of that detriment occurring as amounts *to what it will result* from the original injury." (Italics supplied.) It will be noticed that the last sentence does not read right. There is a hiatus where the term "reasonable certainty" appeared in the asked instruction and the instruction, as given, is not to be commended. We, as do counsel for appellants, construe the instruction as given to mean that the prospective detriment must be probable instead of appearing with reasonable certainty, although, of course, that must be taken in connection with the instruction that the jury were not permitted to give damages which are remote, conjectural or speculative. Defendants insist that the term "reasonable certainty" should have appeared in the instruction. They cite us to the annotations in 85 A.L.R. 985 and subsequent pages which deal, from page 1019 onward, with future pain and suffering. See also 81 A.L.R. 439 et seq. The term used in the instruction asked is prospective *detriment,* which is broader than "pain and suffering," although inclusive thereof. So defendants cannot complain that the court used the same term. However, we shall assume that the rule applicable in such case is not any different than that in connection with future pain and suffering. It appears from the annotation that a great many courts require that future pain and suffering must appear with reasonable certainty, although equivalent

terms will be sufficient. We dealt with the subject of future pain and suffering to a considerable extent in the case of Mahoney v. Pearce, 38 Wyo. 151, 159, 265 P. 446. In that case the court gave an instruction reading as follows: " 'If you find that plaintiff is entitled to recover against the defendant then you will allow him a sum of money that shall reasonably compensate him for the time he has lost by reason of such injuries, if any, and for mental and physical suffering endured by the plaintiff by reason of said injuries, if any, and for such mental and physical suffering as the plaintiff *may* endure in the future. If you shall find that he *shall* endure mental and physical suffering in the future, then you will fix said damages at such amount as if paid at this time would reasonably compensate him for the damages sustained.' " Counsel for defendant say that the second "shall" used in the last sentence of the instruction indicates that this court is committed to the rule that future detriment or suffering must appear with reasonable certainty before the jury is permitted to allow any damages therefor. It appears, however, that the word "shall" above mentioned is merely a grammatical inaccuracy and is used for the word "will." We held in that case that in view of the fact that the evidence showed that the plaintiff would, unquestionably, sustain future pain and suffering, the instruction given was not objectionable. We indicated in that case that courts would not reverse a case in which the word "may" or "liable" were used instead of "reasonable certainty" unless it appeared from the instruction as a whole that the jury were allowed to speculate as to future pain and suffering. We cited a great many cases. In the case at bar, the jury were instructed not to allow compensation for future detriment which is remote, conjectural or speculative. The evidence in the case at bar shows with "reasonable certainty," we think, that the plaintiff will

sustain future detriment as a result of the injury he sustained; that he will sustain future pain in his shoulders, knees and ankles at least for several years; that part of his pain will be alleviated or cured by a future operation, that plaintiff will not have the full use of one of his arms; that, by reason of his broken leg, he will limp the rest of his life; that the muscles of his arms, shoulder and leg have wasted away and will continue to be in that condition; that his nervous system has been, and, in all probability, will continue to be, shattered. We think accordingly that the instruction given fairly comes within the rule of Mahoney v. Pearce, supra, and cannot be held to be cause for reversible error.

5. Present Worth of Future Earnings.

Defendants contend that the court erred in failing to instruct the jury that future earnings should be reduced to present worth. It is generally agreed that when a party is unlawfully injured by another, and by reason thereof sustains loss of future earnings, only the present worth thereof should be allowed, that is to say the present worth at the time of the trial of the case. 25 C.J.S. 895; Chicago & N. W. Ry. Co. v. Ott, 33 Wyo. 200, 237 P. 238. For, as stated in 14 Minnesota Law Review 232: "The reasoning behind the present value rule seems plausible. A plaintiff ought not recover a lump sum measuring the accumulated losses of the future years. Nor should he have a principal sum that will bear an annual rate of interest equal to the wages he has earned because that would leave the principal sum intact at his death. The present value of the future losses of this kind, it is said, is such a sum as will produce an annual rate of interest that together with a portion of the principal sum will afford to the plaintiff what his earned income would have been each remaining year of his life and be completely used up by

the time of his death." The court gave the following instruction on the subject here considered: "In arriving at your verdict as to the amount of damages for permanent injuries, if any, resulting in a permanent loss of earnings by plaintiff, if any, you may consider the mortality tables as tending to prove the life expectancy of the plaintiff. Such tables are not binding, however, and you may determine such life expectancy from your own observations of the plaintiff, and such other assistance as you may obtain from the evidence, and all the facts and circumstances in evidence, including such tables. You have a right to consider the probabilities of accident, sickness, or other happenings reasonably likely to terminate the results of plaintiff's injuries." No exceptions were taken to this instruction, nor was one offered in substitution thereof. It is a general rule that a party cannot complain of an instruction to which no exception is taken. 4 C.J.S. 700; Dec. Digest, Appeal & Error, § 216; David v. Graham, 31 Wyo. 239, 225 P. 789; Diamond Bros. v. Beckwith Quinn & Co., 17 Wyo. 333, 98 P. 889. That rule should apply in this case, unless perchance the error complained of is vital.

A lengthy annotation on the subject is contained in 77 A.L.R. 1439 and 154 A.L.R. 706. In England and Canada no specific instruction on reduction of future earnings to present worth is necessary. It is sufficient if the jury is instructed to give such compensation as under all the circumstances they think is fair and reasonable, taking into consideration, among other items, future loss and damage. Cases from some thirteen jurisdictions of this country are cited which appear to hold that the court is bound to give a proper instruction on the subject, though not requested to do so. The cases from four jurisdictions are cited as holding that it is harmless not to give an instruction on the subject,

if the instructions given are correct as a whole. Cases from sixteen different jurisdictions are cited as holding that failure to give such an instruction is not cause for reversal in the absence of a request to give such an instruction. Cases from six different jurisdictions are cited that the failure to give an instruction on the subject is not cause for reversal, if the damages allowed are not excessive. The author of the foregoing annotation concludes as follows, 77 A.L.R. 1466: "And, therefore, it is submitted that the long line of authorities making reasonable or fair and just compensation the basis of recovery for future loss upholds the reasoning of the decisions which hold that a mere nondirection as to the present worth rule is not a cause for reversal, there having been no request for specific instructions in the matter, the general instructions actually given being as a whole good, and the damages awarded not being excessive." We think that we should adopt that view under the circumstances of this case. It is altogether probable that if counsel for the defendants had called the court's attention to the matter, the instruction given would have embodied their ideas on the subject. The plaintiff in this case, had he not been injured, and had earned the amount which he might have earned in the year before the trial of this case, namely, approximately $4,000 per year, would have earned the sum of approximately $56,000 during the remaining years of his expectancy of life; about $40,000 in ten years; about $32,000 in eight years and about $24,000 in six years. The jury allowed, as hereafter shown, the sum of $21,536.85 for loss of future earnings. So it is quite apparent that either by accident or design, they took the present worth of future earnings into consideration with the like effect as though a specific instruction on the subject had been given. Speaking of this point, the Supreme Court of Iowa in Ingebretsen v. Minneapolis & St. L. R. Co.,

176 Iowa 74, 155 N. W. 327, 332, stated: "The instruction, in the form given, does not inhibit or negative a computation of damages on the basis of present worth, and we cannot assume that the jury did not, in fact, so reach its determination. Such, indeed, would naturally, be the course of intelligent jurors in estimating a sum which would 'fully and fairly compensate' the plaintiff for the wrong done him. As was well said in the Greenway Case, speaking of an instruction like the one given in this case: 'It may well be assumed that the jurors appreciated, without explicit explanation, that they were to estimate the present value of future earnings lost to the injured person.'"

6. Excessive Damages.

It is contended that the amount allowed for loss of future earnings is excessive, and that it is so large as to shock the conscience of the court. We might well have readily agreed with this contention had the case arisen fifteen years ago. But we have had an unprecedented inflation to which it is hard for any one of us to adjust ourselves. The dollar today is worth little over 50% of what it was just a few years ago. That fact must be taken into consideration. 21 Am. Jur. 621. In the case of Weadock v. Eagle Indemnity Co., La. App., 15 So. (2d) 132, 146, the court stated: "Also, the decreased purchasing power of the American dollar, with little or no prospect for any change, except probably further decrease, for many years, is a pertinent factor to be taken into consideration in determining the award." So, too, in Holder v. Key Sytem, 88 Cal. App. (2d) 925, 200 P. (2d) 98, 106, it is stated: "Analysis of awards made in other similar cases, while of assistance, is by no means conclusive, particularly when the cited cases are not of recent origin. 'It is a matter of common knowledge, and of which judicial notice may be taken, that the purchasing power of the

dollar has decreased to approximately one half what it was prior to the present inflationary spiral * * *, and the trier of fact should take this factor into consideration in determining the amount of damages necessary to compensate an injured person for the loss sustained as the result of the injuries suffered.' " In that case an award was made for the death of a man 56 years old in the sum of $45,000, whose job at the time of the decision paid $240 a month. The court refused to reduce the amount awarded. In the case at bar, the plaintiff was 57 years old at the time of the injury and 59 years of age at the time of the trial and the job paid approximately $4,000 per annum or about $333 per month. We must examine the case before us in the light of these authorities.

We agree with counsel for the plaintiff that the amount which would have been earned up to the time of the trial, which appears to be $8,463.15, is not to be discounted, so that deducting that amount from $30,000, which was allowed by the jury for loss of earnings, it appears that the jury allowed the plaintiff for the loss of *future* earnings the sum of $21,536.85 and we must determine whether or not that amount, considered as the present value of future earnings, is excessive. Counsel do not agree on the method of computation. In fact we cannot understand the computation made by counsel for the appellants. They mention the fact that coal miners who have worked for twenty years may retire at the age of 60 years at $100 per month and they seem to base their calculation on what the plaintiff should recover at least partially upon that. But we do not understand that retirement at that age is compulsory. Moreover plaintiff testified that in order to receive retirement pay, a coal miner must have worked as such the year previous to retirement, which, according to the evidence in this case, would be impos-

sible. The bearing that such retirement pay may have in this case will appear presently.

Volume 5, pages 344-345, of the Wyoming Compiled Statutes of 1945, contains interest tables computed at 3 to $4\frac{1}{2}\%$, each separately. These tables are doubtless those used by life insurance companies. The tables seem to be unintelligible to the uninitiated. The last column in the $4\frac{1}{2}\%$ table represents the "present value of $1 for any number of years." It is the column which in life insurance circles seems to be known as "present value of series of payments compounded discounts," and assumes payment at the end of the years. The evidence indicates that the plaintiff might have earned $3,951 for the year prior to the trial if he had not been injured. For the purpose of simplicity, let us assume that the amount was $4,000. If he had lived 6 years after the time of the trial and had earned this amount, he would have earned the sum of $24,000. To find the present value, use the 4th column in the $4\frac{1}{2}\%$ statutory table opposite the number of 6 years and multiply $4,000 by 5.1579 and we find that sum to be $20,631.60 as the present value of $24,000. If a $5\%$ table were used as found in life insurance tables, the present value would be $20,302. To find the present value of $28,000, which the plaintiff might have earned in 7 years, multiply 5.8927 by $4,000, under the statutory table, and we find the amount to be $23,570.80. It would be somewhat less if a $5\%$ table were used. If plaintiff might have earned the above wage for longer years, the present value would, of course, be much larger. The same result as above mentioned, or at least approximately the same result, would be obtained by using the 2nd column of the $4\frac{1}{2}\%$ statutory table, but if that column is used, the value of the dollars for the various years must be computed separately for each year, and the separate computations then added for the number of

years desired. The correctness of these amounts may be proven by simple arithmetical computations, assuming the present value as above stated.

We do not, of course, know how long the plaintiff in this case would have been able to work had he not been injured and would have earned the same amount of money as he earned in the past. He might have been able to work at the same wage during the remainder of his expectancy of life (14.37 years), though that is not probable. We do not see how we can hold that the jury were not justified in believing that he might have worked for 6 years longer at the same wage. The plaintiff would then have been 65 years of age. And let us be as liberal to the appellants as we can and agree with them that since the withholding income tax of the Federal Government never gets into the hands of the workman, his actual wage was his "take home" pay, so that he would have received during those 6 years approximately $3,400 per annum instead of $4,000 per annum or a total of $20,400. The present value of that amount would, computed at 5% compounded interest, be the sum of $17,257.38. If computed at $4\frac{1}{2}\%$ mentioned in the table of our statute, the present value would be $17,536.88. But we have no right to assume that the plaintiff would have earned nothing after becoming 65 years of age. If he had not been injured, he might then have retired, according to the testimony at $1,200 per annum or $100 per month. The present value of the amount which he might have received after 65 years of age to the time of the end of the expectancy of his life, that is to say from the end of 7 years to the end of 14 years (a total of about $9,600) would have been approximately $5,750. Adding this amount to $17,257.38 makes a total of $23,007.38, or adding it to $17,536.80 makes $23,286.86—a larger amount than that allowed by the jury.

The tables used are not absolutely correct in figuring the present value here in question. Coal miners are not paid at the end of the year, but every two weeks and the present values above stated would be somewhat less than those above mentioned. But to attempt to get an absolutely correct result by reason of such payments made every two weeks, would mean endless computations, and no jury could be expected to indulge therein. All that can be expected of a jury is to measure the present value of future earnings fairly under all the circumstances shown in a case. In view of the uncertainty of life, and the possible change of conditions generally, only an approximation of the amount can fairly be expected. Appellants cite us to Kramer v. Chicago M. St. P. & P. R. Co., 226 Wis. 118, 276 N.W. 113, in which the verdict was held to be excessive. The case does not in any way aid them. The jury in that case gave $5,000 to the plaintiff for pain and suffering and inconvenience. The supreme court held that not to be excessive. The jury further assessed the plaintiff's loss of earnings at $25,000 of which $4,830 would have been earned up to the trial of the case. That amount, just as we have done in this case, was left undisturbed, leaving the future earnings at $20,-170. The court, using tables like those we have used, but computed at 5% simple interest (we need not mention the 4%) found that since the loss of earnings throughout the remaining years of his expectancy of life of 18 years was $1,330 per annum, the present value would have been $12,781.81, which would be $7,388.19 less than the amount allowed by the jury. Under these facts the court could not, of course, permit the verdict to stand. It may be noted that in the case at bar we have not assumed that his annual loss would continue the same throughout the years of his expectancy of life.

Taking all the facts and circumstances in this case into consideration, we are unable to say that the amount allowed is excessive. It is generally held that unless it clearly appears that the verdict is excessive, courts will not interfere. 15 Am. Jur. 621, § 205; Northwest States Utilities Co. v. Ashton, 51 Wyo. 168, 65 P. (2d) 235.

The judgment of the trial court is affirmed.

*Affirmed.*

RINER, J., and HARNSBERGER, J., concur.