Celestino FLAIM, Personal Representative and Administrator of the Estate of Joseph Guido Flaim, Deceased, Appellant (Plaintiff below),

v.

Paul Dominick BERTI and John Dennis Browne, Appellees (Defendants below).

No. 4116.

Supreme Court of Wyoming.

Dec. 6, 1972.

Murane, Bostwick, McDaniel, Scott & Greenlee, and Edward E. Murane, Casper, for appellant.

Bard Ferrall, Cheyenne, for appellee Berti.

E. J. Herschler, Kemmerer, for appellee Browne.

Before McINTYRE, C. J., and PARKER, McEWAN, and GUTHRIE, JJ.

Mr. Justice PARKER delivered the opinion of the court.

Plaintiff filed a complaint for the wrongful death of Joseph Guido Flaim, alleging that the defendants, drivers of two automobiles involved in a drag race, were negligent, and asking jointly and severally for damages in the sum of $300,000. Defendants answered, claiming they were not negligent and that Flaim was contributorily negligent, such negligence being the proximate cause of the accident. The matter was tried to a jury which found for the defendants and against the plaintiff. Judgment was rendered accordingly, and plaintiff has appealed contending (1) there was no evidence whatever to show that Flaim was guilty of contributory negligence and (2) the court should have allowed plaintiff's proffered instruction on last clear chance. The pertinent facts in this cause are not disputed. The parties stipulated that an accident involving the motor vehicles driven by defendants and a motorcycle driven by fifteen-year-old Flaim occurred during the evening of August 14, 1970 (testimony established the time as between 11 and 11:30 p. m.) on U. S. Highway 430 south of Rock Springs, Wyoming.[1]

A quarter-mile drag race had been completed, the cars traveling the distance from south to north; and the accident occurred during a second drag race when the cars

1. At the time of the trial in February 1972 Berti was nineteen and Browne twenty-one.

were going the quarter-mile distance from north to south, defendant Berti's vehicle striking Flaim's motorcycle.

Earlier that evening Flaim and a friend, Reuter, had attended the county fair with their girl friends. They had engaged in conversation with the defendants and learned there would be a drag race between Browne and Berti. Flaim and Reuter took their girls home and proceeded to Highway 430, arriving there a few minutes before the defendants. Initially the cars engaged in the quarter-mile drag race downhill from south to north. Berti believed he obtained a speed at the end of the drag race of seventy to seventy-five miles an hour, Browne beating him by four or so car lengths. The finish line for the first drag race was at the Salt Creek Freightways driveway. The defendants then lined up at the Salt Creek Freightways yard entrance for a second drag race, uphill, from north to south. Reuter, volunteering, had started the cars for the first race; and he and Flaim had then gotten on their motorcycles and proceeded behind the cars to the Salt Creek Freightways driveway. The defendants' cars reached their top speeds at the end of the quarter-mile and went beyond the driveway. When they returned, besides Reuter, Flaim, and their motorcycles, the driveway was occupied by the vehicle of Mr. and Mrs. Zanetti, who with their son were also present. As the defendants lined up for their second drag race, Mr. and Mrs. Covert in their automobile with a young couple drove up; the racers moved their vehicles so they could go by and, some distance short of a quarter-mile, the Covert vehicle was parked perpendicular to the highway, the occupants viewing the drag race.

Reuter again prepared to start the racers, standing off the highway to the west in front of the vehicles and using his arm to signal. Browne, who for the second drag race was occupying the east side of the highway in the northbound lane, had called out through his opened window, mainly addressing Mr. Zanetti, fifteen to twenty feet away, who had "been out there before," that they needed a spotter. Flaim, who was on his motorcycle on the north side of the Zanetti car, started his motorcycle and left at what appeared to Browne as a high rate of speed (maximum speed of the motorcycle was ninety miles an hour). Browne observed him for a short time and then turned his attention to the drag race, watching for Reuter to signal. Reuter, who had been looking at the cars ready to signal, said he was aware of Flaim on his motorcycle, leaving the area, going south, headlight and taillight burning, but had paid no particular attention to him and proceeded to start the race. Both Browne and the occupants of the Covert car observed that as Flaim left he traveled on the center line or close to it.

Shortly after Flaim started up the highway the cars took off on a signal from Reuter. One of the passengers in the Covert car said Flaim "got a pretty good distance up" before the cars started. The Browne vehicle was ahead of the Berti car by several car lengths. His lights were on dim and he could see for approximately two hundred yards; however, he was not aware of the Flaim motorcycle until he was about twenty feet from it. The motorcycle was right on the center line. Defendant Browne had just shifted from third to fourth and was traveling sixty-five or seventy miles per hour. Upon seeing Flaim he shifted back to third. Browne was some distance to the left of the center line although from the left front of his car it looked to him as though he were in line with it, and he pulled over to the left and passed the motorcycle. Browne said that Flaim turned around as Browne's left front and left rear tires got off the pavement, knew Browne was there, and was picking up speed. After Browne passed Flaim and pulled back into the traffic lane, he looked into his rear view mirror but saw nothing. Defendant Berti, who had been watching the back of the Browne car, had covered approximately 1100 feet of the quarter-mile distance (normally it took about nineteen or twenty seconds from a

standing start to cross the quarter-mile marker), and had not obtained maximum speed (seventy to seventy-five miles per hour) when he noticed the motorcycle in the center of the road. After Browne had passed it, and when Berti first observed it, the motorcycle swerved into his lane; he applied his brakes and tried to flip his wheel to turn his vehicle to the right, off the road. His left front fender came in contact with the rear of the motorcycle at a point about one or two feet from the west side of the highway. Flaim, who had not been wearing a helmet, was taken to the hospital still alive. Upon a physician's advice an attempt was made to take him to Salt Lake City, and he died en route. According to Mrs. Covert, an observer of the race, Flaim had been out of the way of both the racing vehicles until he swerved over in front of the Berti car.

## Contributory Negligence

Plaintiff argues that there was no evidence whatever to show that Flaim was guilty of contributory negligence, that he was driving up the highway, which he had an unqualified right to use, and that a reasonably prudent man would assume the drag racers would not begin the race until he was out of their way, and insists that only one inference can be drawn from the facts presented, i. e., Flaim by his conduct did not fall below the "standard to which a reasonably prudent man would perform under like circumstances," citing Johnston v. Vukelic, 67 Wyo. 1, 213 P.2d 925, 930.

 From a consideration of all the evidence, we conclude that the matter of contributory negligence was a question properly submitted to the jury; and as we have often commented, the issue of contributory negligence is generally a matter to be determined by the jury or by the court in a trial without a jury. Dallason v. Buckmeier, 74 Wyo. 125, 284 P.2d 386, 389. In the instant situation the fact that a motorcyclist would proceed down the center line of a highway knowing that a drag race was imminent would alone be sufficient to make a jury question of his contributory negligence. Moreover, his contributory negligence must be determined by his actions—not the lack of care on the part of the defendant drivers—and we have the matter of his turning his motorcycle to the right into the path of the Berti car, apparently without looking behind him.

## Last Clear Chance Doctrine

Initial appraisal might indicate more merit in the second ground of appeal, plaintiff's criticism of the trial court's having refused the last clear chance instruction. However, that also does not bear scrutiny and in-depth analysis. Citing 47 Yale L.J. 704 and 53 Harv.L.Rev. 1225, the plaintiff points out that the doctrine of last clear chance was adopted to counter the harsh results of contributory negligence, and quotes from Borzea v. Anselmi, 71 Wyo. 348, 258 P.2d 796, 802, where this court said that the last clear chance doctrine is not an exception to the general doctrine of contributory negligence but operates merely to relieve the negligence of a plaintiff or deceased in a particular instance, which would otherwise be regarded as contributory, from its character as such.

The plaintiff submits that the instruction which it proffered to the trial court was taken from the following language of the Borzea case, quoting the rule stated in 2 ALI Restatement, Torts § 479 (1934):

"'A plaintiff who has negligently subjected himself to a risk of harm from the defendant's subsequent negligence may recover from harm caused thereby if, immediately preceding the harm.

"'(a) the plaintiff is unable to avoid it by the exercise of reasonable vigilance and care, and

"'(b) the defendant

"'(i) knows of the plaintiff's situation and realizes the helpless peril involved therein; or

"'(ii) knows of the plaintiff's situation and has reason to realize the peril involved therein; or

" '(iii) would have discovered the plaintiff's situation and thus had reason to realize the plaintiff's helpless peril had he exercised the vigilance which it was his duty to the plaintiff to exercise, and

" '(c) thereafter is negligent in failing to utilize with reasonable care and competence his then existing ability to avoid harming the plaintiff.' " [2]

Plaintiff argues that, should the court say contributory negligence was established, all other elements of the last clear chance doctrine were shown; and he proceeds to examine each of the elements in an effort to substantiate this contention. As to the first criterion, "(a)"—plaintiff's inability to avoid the harm by the exercise of reasonable vigilance and care—he says:

"From the evidence presented, it is clear that by the time Joey Flaim realized the situation he was in, with cars on either side of him, he was unable to avoid the cars. He apparently swerved to get out of the way of the Browne car and this put him in front of the Berti car. He was attempting to get off the road and the actual impact area was judged by Berti to be one or two feet from the west side of the highway. It is apparent that Joey Flaim realized his position at or about the point of time when the Browne vehicle passed him, and was attempting to get out of the way. Applying the language of its being 'impossible for [him] to extricate [himself], the facts of the accident show that he didn't have time to get out of the way.' [Woods v. Siegrist [112] Colo. [257], 149 P.2d 241, 244.]"

■ While the evidence warrants the conclusion that at the moment of swerving deceased did not have time to get out of the way of the Berti car by turning to the right, it does not necessarily follow that he was unable to avoid the accident by the exercise of reasonable vigilance and care. Moreover, plaintiff concedes that when the motorcycle swerved into Berti's lane there was no time to avoid the accident. However, it is his position that the question is not whether this was the point at which the duty to Flaim began but, rather, at what point in time a discovery of the peril of Flaim should have been made. Granting this to be true, the evidence does not disclose the situation to be such that the deceased was unable to avoid the accident by the exercise of reasonable vigilance and care. Thus, the trial court was justified in holding the last clear chance doctrine inapplicable. As the plaintiff's witness Covert said, Flaim "was out of their way, but when he swerved over he was right in front of Berti's car." We find no error in the challenged ruling of the trial court.

Affirmed.

2. In essence this rule is reiterated in 2 ALI Restatement, Torts 2d, § 478 (1965), and it is of interest to observe the comment at p. 531, "In reality the rules of the last clear chance appear to arise out of a dislike for the defense of contributory negligence, which has made the courts reject it in situations *where they can regard the defendant's negligence as the final and decisive factor in producing the injury.*" (Emphasis supplied.)